We're ready to hear our first case, Sanderford v. Duplin Land Development, Mr. Potter. Good morning, Your Honors. Good morning. May it please the Court, my name is Samuel Potter. I represent the appellant, James K. Sanderford. The matter is before you on the appeal of a summary judgment order granted by Judge Malcolm Howard v. Eastern District of North Carolina as to all claims that the plaintiff brought. The underlying case focuses primarily on two issues. Number one are contract-related issues. Number two are misrepresentation-related issues, which gave way to three claims, the misrepresentation claims that are, that is, under the Interstate Land Sales Full Disclosure Act, North Carolina Unfair Trade Practices Act, and common law fraud. Our strongest argument is that the District Court erred in applying the standard on summary judgment. That is, it is our contention that the record reveals a litany of disputed issues of fact regarding terms of the contract as well as whether representation for material or whether there were misrepresentations at all. I believe that the briefs that are before you go through the facts and the disputed facts in great detail. I'm not going to waste the Court's time going over that at this point. Instead, I'd like to start and focus with the Interstate Land Sales Full Disclosure Act claims. The underlying claims arise out of the sale of a residential lot in East, in the, in Duplin County in southeastern North Carolina. Unlike previous cases before this Court, the question of whether the lot fell within the Interstate Land Sales Full Disclosure Act is not in dispute. There was a HUD property report that was issued under the Interstate Land Sales Full Disclosure Act to the plaintiff, and I don't think that there's any dispute that the act applies. The plaintiff's claims arise out of 1702A, 2A, B, and C. A, 2A. Why don't you just, it would be helpful for me if you just explained what you think the misrepresentations are and why they constituted fraud and go from there. Sure. The misrepresentations, the lot in question had fecal matter on it, and this was disclosed to the client, to plaintiff prior to acquiring the lots. The fecal matter apparently came from municipal sludge, so it was human fecal matter, not animal fecal matter. Well, different kind of animal fecal matter. The plaintiff was presented with an opportunity at that point in time to either walk away or to move forward. And in order to convince the plaintiff to move forward, there were representations that were made that we contend were not true. And what were those? Those representations were that there would be an independent third-party company, specifically a company by the name of the Clark Group, which were consulting engineers, environmental engineers who do work throughout southeastern North Carolina, that this independent company, and in fact the contract says, or other qualified consulting group, would conduct water, surface, and groundwater testing and would confirm that the fecal matter on the property had decreased to acceptable standards on or before November 1, 2007. So, that was the representation. Now, the next question is, well, what part of that was not accurate? Well, it turned out the Clark Group did not do the sampling on the property, nor did any other qualified consulting firm, who actually ended up doing the sampling, was a sister company of the defendant, Duplin Land Development. And I think this is an incredibly important issue to point out, and I understand you got the record, and typically you don't want us to point to the record, but there is very specifically in the record a statement in the deposition of Mr. Kevin Hahn, who was the general manager for Duplin Land Development, that no employee of either Duplin Land Development or its sister companies were qualified to do this type of testing. I thought that all that the DLD did was to collect, or that the sister company did was to collect the soil samples and send them to the Clark Group for monitoring and testing. I think the way that the Clark Group affidavit reads, actually, is that the sister company collected the samples, provided them to a lab, the lab analyzed the results, this may be a technical point, but the lab analyzed the results and then passed on the results to the Clark Group, I think was the exact order of things. The point is, though, Your Honor, is that, and I pointed this out in the brief, this is a proverbial fox guarding the hen house. There was a representation that it would be an independent company, the Clark Group specifically, or other qualified firm, thereby a company that had the same qualifications of the Clark Group. I thought, I mean, I'm pretty sure the record indicated that the Clark Group performed the testing. The Clark Group performed the testing until May of 2007. The contract was entered into in June of 2007. That's another particular factual issue that I think is important for the Court's consideration, that after May of 2007, it was a Duplin Land Development sister company that did the sampling. Are you splitting hairs between sampling and testing, or are you using that as synonymous? I mean, going out and getting the samples and then giving them to Clark is one thing, and going out and getting the samples and testing them yourself is something else. Well, I think the record's not clear on that. What the Clark Group affidavit, or Stephen Clark of the Clark Group said, was that the Duplin Land Development sister company collected the samples and provided them to a lab. They didn't provide them to the Clark Group. They provided them to a lab. The lab analyzed the results, and then the lab provided those results to the Clark Group. And what is the mystery? So your objection is that was the lab a sister company? That's not in the record. That's not in there one way or the other. Did you ask? To be honest, Your Honor, during depositions and during discovery, both in the written interrogatory responses, we asked who was involved in the sampling and the testing, and their response was the Clark Group, period. They did not disclose to us. It was only through studying the Clark Group report to the Division of Water Quality that I noticed the words weren't exactly clear as to who did the testing. It basically said that Duplin Land Development has asked us to ask the Division of Water Quality to approve the testing to this point. And then it said something about how the Clark Group continued testing through May of 2007. Well, I knew at that point in time, based on other records produced, that there was sampling and testing conducted after May of 2007, and it was through further interrogatories and further discovery that we ultimately learned that it was a sister company of Duplin Land Development that was collecting samples and providing them to the lab. And it's our contention that... Van laboratories. Van laboratories. I'm sorry, I couldn't remember the name of the lab specifically. I have no idea if they're a sister company or related to Duplin Land Development or not. The point is, is the representation, the specific representation that was made to my client to induce him to move forward with the contract rather than wait for this issue to be resolved at a later date, was that it would be independent, it would be the Clark Group or other qualified consulting company. I did ask the general manager during his deposition, and this is in the record, about whether or not Duplin Land Development or its affiliated companies... Duplin Land Development is affiliated with the Murphy family. They're well-known in southeastern North Carolina. They have a... they, I believe, sold a large part of their holdings in pig farms. They're well-known. And so I asked whether any affiliated company was authorized... I'm sorry, was qualified to do this type of testing. This is in the deposition transcript, and I can certainly reference that for you. No, because you're not disputing that... you're not contending that the sister company did the testing. You're only contending that the sister company collected the sample... That's correct. ...and sent them to Van Laboratories for testing. That's... And you are arguing under Addendum B, that is the basis of this, of your cause of action here? Well, that's the basis of the contractual cause of action. The representations are reiterated in Addendum B, but they are also reiterated in the affidavits that were provided by the realtor who was involved in the transaction, Mr. Mack Rogerson, who was an exclusive employee of Duplin Land Development. So we would contend that... Okay, but your cause of action against DLD grows out of the Addendum D that was signed? Addendum B, that's correct. I'm sorry, Addendum B. Why doesn't Addendum B simply constitute an agreement to agree? Because under North Carolina law, and this law is cited in my brief, you don't just stop at the plain language of the contract, especially when... But you do if it's plain, don't you? Well, you don't, actually. If the plain language is an agreement to agree, our courts, the North Carolina Court of Appeals, has said that you look to contemporaneously signed documents and the intentions of the parties. Well, what is the right of the plaintiff in the event that there's a breach of contract? What is the right established in the contract? It's an either or, isn't it? It is an either or, and the question was... And the parties will agree later whether it's either or. That's what it says in the contract. There's no question about that. The HUD property report states something different. It states that the seller shall be entitled to a refund or, to the extent available, can trade in for another lot. And so it's our contention that language suggests more of a seller option to do... If you want, you can get your money back. Why do you go beyond the language of Addendum B when it's not ambiguous? It may not establish a remedy, but that doesn't mean it's ambiguous. Because that's what the North Carolina Court of Appeals says you do. They say you do what now? I'm sorry. They say that in the event that you have a contract that appears to be an agreement to agree, that doesn't end the analysis, even if it's not ambiguous. And the case law that's cited in my brief, it was a situation where there was a realtor who contended he was entitled to a commission. The agreement on its face was an agreement to agree. And what the Court of Appeals did is they said, we're not going to stop there. We're going to look and see if there are contemporaneously signed documents or whether the intentions of the parties could decide whether it was an agreement to agree or whether this was, in fact, a real agreement. I mean, a contract is nothing but the intentions of the parties put in writing. But the record in this case we contend is clear. Right, but even notwithstanding that law, doesn't Addendum B still have to, after you consider the other documents, manifest the intent of the parties, as you say? Or you're saying you can look to everything for the intent of the parties and not merely for a clarification of what Addendum B means? I think the Court of Appeals, the North Carolina Court of Appeals, that is, since this is under North Carolina law, has said that agreements to agree, or I would argue that agreements to agree are different from your standard ambiguous contract. If the court looks at it and says it's an agreement to agree, they don't stop there. Even if on its face it is an agreement to agree. So, in other words, if the four corners are agreement to agree, you go a step further to make sure. Because, for example, in a case like this, my client performed. My client paid money for a lot. Perhaps you could explain to me where that gets you. If we go beyond the four corners of the document, then what? How does that help you? You still have to come back to the fact that if you're enforcing, if this is what you're trying to enforce, all this does is give you three options. There are three options here. But there's nothing in the contract that says who picks. That's why you look outside of the contract. But how does that help us decide who picks? Because the intentions of the party in the record are clear. The intentions of the party in the record clarify this issue. Do you think DLD intended that you get to pick which of the options? Do you think there was a meeting of the minds on that point? Yes. And the meeting of the minds was that my client was entitled to get his money back. That's why he hand wrote the language in there. He's a layperson. That's what he was trying to accomplish. That was what was promised to him by the realtor. And the general manager of Duval Land Development stated in no uncertain terms that the entire intent, and this is cited verbatim in my brief, the entire intent was that if the notice wasn't timely given, then he would get his money back. Thank you. Thank you. May it please the court. Good morning, Your Honors. I'm Reggie Gillespie. I represent Duplin Land Development, the appellee in this case. Mr. Gillespie, do you agree that there was a meeting of the minds that Mr. Potter would be able to get, would be able to select the option and get his money back? No, ma'am, I do not. Judge Duncan, I don't. As a matter of fact, I'd like to speak, if the court will allow me, regarding Zinn v. Walker. I'm intimately familiar with that case because I represented Carol Ann Zinn in that case 26 years ago. And in preparing for this case, I've forgotten how long it had been. But in the Carol Ann Zinn case, the court held to the doctrine that an agreement to agree, that is an agreement that leaves open for further negotiation, the essential terms of the agreement is void and unenforceable as an agreement to agree. What happened in the Carol Ann Zinn case, Zinn v. Walker, was Ms. Zinn and Mr. Walker executed what was known as a resale profits agreement. But that was one of three documents that were signed at the time. The opinion in that case makes very clear that all three documents were signed as part of the same transaction at the same time, and indeed the court recognized that Ms. Zinn would not sign the other documents unless the resale profits agreement was signed at the same time. So what the court had before it in Carol Ann Zinn, in the Zinn case, was three documents that were signed as part of the same transaction. It was all one contract. That is what the court of appeals concluded in that case. In this case, there is just one contract. That is the land purchase agreement in this case, which has addendum B, which is the document that the parties are arguing about here. And addendum B very clearly states the parties, the seller and the buyer, will agree to one of the three options. Well, that's not really correct because the third option doesn't have an or in it, in your brief, so you're adding that in and you put an emphasis under the or in the brief, and that's not in the contract. It just says we'll do it. There's no or there, is there? No, sir, there is not. You read one in in your briefs anyway. Yes, sir. In the testimony, it's unclear what exactly, how that fits in, because item three is duplicative, arguably, of item one. No, your client signed it. Yes, sir. But you're also not taking the position that addendum B is unenforceable, are you? Yes, sir. You are? Yes, sir, it is unenforceable. Well, that's interesting because on page 18 of your brief, you said, first, DLD does not contend that addendum B is unenforceable. The remedy provision is unenforceable as an agreement to agree. And that's what the court, that's what Judge Howard held as well. What addendum B does. I mean, you do say in your brief twice that you don't contend that DLD is unenforceable, right? Well, addendum B is not unenforceable. Well, I mean, that's not what you told Judge Howard. I mean, I can show you a brief that says on pages 18 and 19 that, first, DLD does not contend that addendum B is unenforceable. Next paragraph, DLD has never argued in this action that addendum B is unenforceable. And now here you're arguing that addendum B is unenforceable? Well, what I would submit to the court is. I guess the answer to that is yes. Yes, addendum B is not enforceable as to the remedy that the plaintiff is seeking in this case because addendum B says with respect to that remedy, the parties will agree as to what flows if there is the failure to provide if the condition is not satisfied. So that's probably a jury issue, right? No, sir, I don't think so. Again, the parties will agree. The case law is clear that that is the expression of a desire. What's the jury going to decide? The jury cannot determine who makes that determination. The parties will agree. Well, the jury can decide that after there's testimony as to what the parties intended. I'm sorry, Your Honor. After there's testimony as to what I meant and what you meant, and there was a meeting in the minds, and that's what jury trials are all about. Well, but if the testimony is that if Duplin says one thing as to the intent, the plaintiff says the other as to the intent, there's clearly not a meeting of the minds as to this aspect of the agreement. And first and foremost, though, before reaching the intent, the court must look at the language and whether the language is ambiguous or unambiguous. In this case, it is unambiguous. The seller and the buyer will agree to one of the following outcomes. This case, in this reception. There's no will agree in there. It just says will do such and such. Well, but that follows the prefatory language, the parties will agree. If there was an or there like you added in your briefs, that may be true, but there's not one. Well, it's couched as item three, Your Honor. Well, no, but there's no or item three as there is or item one and or. If you took out one and two, it still provides for the parties will agree. It doesn't say the parties do agree. It doesn't specify this is what will happen. It doesn't say who declares that that will be the outcome. We respectfully submit, Your Honor, this is a case in which the outcome that the plaintiff argues for is not specified in the agreement. And in that case, it's very much like the Boyce v. McMahon case in which the agreement there was the parties entered into this preliminary agreement expressing the desire, and they will later enter into a formal agreement. And the court held that that expression of desire was insufficient to constitute an agreement because it left open for future negotiation. It left open for future decision what the outcome would be. In this case, we respectfully submit that the language, the buyer and the seller will agree, leaves the outcome undetermined. And because the outcome is undetermined, then it makes it unenforceable. Returning to the, we submit further, Your Honor, that we don't agree that the provision comes into play anyway in this sense. This is a case in which the plaintiff is not claiming he did not receive the benefit of his bargain. The plaintiff received a residential building lot at the agreed price. The lot was suitable for construction when it was promised. And by all accounts, there's no problem with this lot. So the plaintiff got the benefit of his bargain. As Mr. Potter pointed out, this is a performed agreement. And this is a performed agreement in which the plaintiff got the benefit of his bargain. It's an executed contract. In this case, what the plaintiff is seizing upon is a two-day delay, if it is a delay at all, in seeking to invoke rescission of this contract. In this case, there's no evidence whatsoever that the plaintiff suffered any adverse consequences during this two-day delay. The plaintiff's position wasn't changed. No one else's position vis-a-vis the plaintiff was changed. In fact, there's nothing that happened relevant to this case during that two-day period. And we respectfully submit that in this case to try to invoke a forfeiture for this two-day delay, even if it is a delay, is inappropriate. The plaintiff is seeking rescission of an executed contract for a technical, if it is a violation at all, a technical violation that had absolutely no consequences for anybody, in the context in which the plaintiff got the benefit of the plaintiff's bargain. We submit that that is an inappropriate result in this case, irrespective of the agreement to agree or any other issue. We respectfully submit that's an inappropriate outcome in this case. We point out further that with respect to that particular point, with respect, we submit that there wasn't even a violation in the first place. I say that because the notice was mailed on October 31st. If you look at the language of the agreement itself, it's 147 of the record. The agreement itself says that the seller must receive the confirmatory report and notify the purchaser. If the seller does not receive the confirmatory report and notify the purchaser by November 1, then the seller and purchaser will agree. Well, the only context in which receipt is used, the only way receipt appears in this case, is receipt of the confirmatory report. And if one steps back and thinks about the object of this transaction, the object was, as established by the record, to provide a buildable lot on which construction could commence by November 1. And the critical prerequisite to that was a clean bill of health, if you will, from the consultant. And so the agreement is structured, if the seller does not receive the confirmatory report and notify the purchaser, we respectfully submit that both of these conditions were met. The confirmatory report was received, there's no dispute in the record, before November 1. Secondly, Duplin notified the plaintiff and all the other buyers by sending out the notice on October 31st. I would respectfully submit that depositing that notice in the mail, like in so many other contexts, such as service in this court, service in the courts, deposit in the mail is complete. And I respectfully submit that that is sufficient in this case. Indeed, think about the Carol Ann Zinn case. When I mailed that brief, when I stuck that mail in the brief on the deadline, it was complete. And I respectfully submit that there's nothing in the contract that precludes the court here from adopting the same sensible rationale, that the notify, which is not defined in this contract, that notification occurred upon deposit in the mail. And that fits the majority of other transactions and business and other matters in which notices are sent and received. I'd point out further that it's in the record that in this case, the closing of this sale occurred by mail. So there's a precedent in this case of using the mail to accomplish the performance of the contract. And in this case, I respectfully submit the performance contract was likewise accomplished by depositing that notice in the mail. Did you argue that in front of Judge Howard? No, sir. No, Your Honor, I don't believe we did. I wish I could have. I will tell the court I wasn't involved in the case. I would like to have made that argument. I would have made it every bit as passionately as I make it today to the court. With respect to the representations aspect of this case, the court had some questions on that. I think the court has appropriately focused on the issue, and that is sampling. Collection of samples was taken by an affiliated company employee. But the testing, the analysis, the reporting, the remediation was all done under the supervision of the Clark engineering firm. And what the contract says with regard to that is that additional sampling at the property and the seller obtains a written report indicating the results of sampling confirmed previously identified fecal coliform has degraded. Again, the issue here was the degradation of the fecal coliform and the confirmation of that by a qualified consulting firm, which was the Clark group, which did that confirmation, which did that confirmation within the time provided in the contract. Referring back to the HUD property report and putting this in context, the HUD property report refers to a consultant or our consultant providing a report. That's the disclosure that was made in the ILFSDA report. In this case, the consultant did provide a report. The representation in the addendum A is that the Clark group or other qualified consulting firm will undertake additional sampling, and that is exactly what happened. The Clark group did undertake the additional sampling, and as the record reflects, over the course of time, when that became cost prohibitive to Duplin, Duplin tasked an employee of a sister company, who the record reflects was qualified to do this, a technician who handled the sampling or other ventures. The record reflects that this is the person who did that, who turned it into the independent lab that was reviewed by and reported by the independent consultant. So there is no issue in this case we've submitted with regards to using the affiliate company's employee for collecting the samples. The plaintiff makes heavy reliance on the affidavit and the representations made or the testimony made of the real estate agent, Mack Rogerson. And if you look carefully at what he said in his affidavit, he said that Duplin, quote, would hire independent testing firms to monitor the property and oversee and remediate the fecal coliform in the bluffs. That's the representation that was made to the plaintiff. That representation was fulfilled. Duplin hired the Clark group. The Clark group oversaw the monitoring. The Clark group oversaw the testing. The Clark group oversaw the reporting. The Clark group actually did the reporting. The Clark group was involved in the remuneration process. So in respect to what was represented, what the plaintiff claims was represented to him, that representation was fulfilled. Second, as I said earlier, Mr. Linton's qualifications as the employee, they haven't been challenged. He was affirmatively shown to be a, quote, qualified technician responsible for environmental testing and monitoring on various properties. Indeed, he was certified by the state. That's in the joint appendix at 398. Third, and I think most importantly, the extrinsic evidence in this case confirms that there was no defect in what was accomplished here. That is to say, the consultant, Mr. Clark, said that the sampling and the results of the sampling that were gathered by the Murphy employee were consistent with the sampling that was gathered by the Clark group. Indeed, it produced the expected result that this condition degrades over time. This condition was expected to degrade over time, as all the evidence in this case reveals. And so what was done was the entirely unsurprising result was obtained that was entirely consistent with the previous results. The point is that there was no injury, no consequence, no burden that was visited upon the plaintiff by virtue of this person collecting the sample, by virtue of Mr. Linton collecting the samples. And ultimately, the state cleared the property. The state division of water quality found that there was no further action required and that the matter could be closed. So at that point, the property was cleared for construction. And that occurred before November 1, within what the contract anticipated, within what the HUD property report anticipated. I would like to point out also that the cases are pretty clear that the expression of an intent to do something future, a promissory representation, is not in its face, is not in itself, deemed a fraud simply because it didn't occur. The plaintiff must show more. The plaintiff must show an intent not to honor the promise at the time it was made. And there's no evidence whatsoever to this effect. As a matter of fact, the Clark group did continue to perform even the sampling aspect of the work and certainly continued the monitoring, testing, and reporting of the work long after the time the related employee got involved. I'd also like to point out that on the subject of the alleged misrepresentation, the plaintiff has failed to offer any proof of injury or damage. And it is essential in this case that the plaintiff tie these alleged misrepresentations to some adverse consequence. And in this case, the evidence is undisputed. Number one, there's no evidence the lot is contaminated. Number two, there's no evidence the lot is not suitable for construction. There's no evidence the lot's marketability or value were in any way affected by these alleged misrepresentations. There is no evidence of damage in this case. Instead, all we have is the plaintiff's conclusory allegation. It has been damaged. In the context of a complaint, this allegation would be insufficient. Simply saying, you injured me and I'm damaged, in the context of the Supreme Court's recent pronouncement in the Ashcroft case, is insufficient. And that concept has been applied in the Venezia case in an Interstate Land Sale Full Disclosure Act. In this case, we're at summary judgment. The plaintiff can't rest on his mere allegations. In this case, it's at even higher standards to submit. The allegations are insufficient to begin with, but we're even further down the trail where something even more than that has to be shown. We submit that that hasn't been shown, and therefore, there is no basis for misrepresentation holding this case. In this case, the plaintiff seeks rescission. Rescission is an equitable remedy. One who seeks equity must do equity. In this case, we submit that it would be wholly inequitable for the plaintiff having to receive the benefit of his bargain, including 18 months of prepaid interest, 18 months of homeowners association dues, to accept and receive and retain those benefits. And then, after the fact, use the gotcha approach of the gotcha for two days layman's. We submit that's inappropriate. We submit that's inequitable. Your Honors, the plaintiff's an engineer. He has experience in property development. He helped develop a soccer complex. He's done small developments of his own. He's a civil engineer. He's not a layperson and is well capable of making the appropriate decisions. In this case, he made an investment decision which, in retrospect, may not be as active as he originally thought. But that's not due to any act or inaction by the defendant, by Demplin. In this case, we respectfully submit that this is nothing more than a remorseful buyer trying to find a way out now. And we respectfully submit that the court should not allow that to occur on the facts of this case. Thank you. Mr. Potter, when you're ready. Thank you. Counsel for the appellee argued that we have not been damaged, that my client has not been damaged, and points to no evidence of economic damages or anything else. My client was promised the right to get his money back if something wasn't done. We are seeking specific enforcement. That is our contractual claim. Where has your client promised the right to get his money back? In the contract, in the verbal representations of the defendant, and in the HUD property report. How do you get to the HUD property report? Was it contemporaneously signed? I'm not sure if it was contemporaneously signed by my client or not. That was not, isn't that true? I'm not 100% certain of that. My client signed the contract on April 5, 2007. I'm not sure if he signed the HUD property report that same day. The HUD property report has to be provided, I believe, maybe two or three days prior to signing the document. However, the HUD property report itself says that the seller will be able to get his money back. Right, I'm just trying to reconcile those facts with the holding in Zinn, which seems to rely on contemporaneously signed writings, maybe incorporated together to define the meaning of the contractual hold. Sure. So they were really talking about a group of documents executed, as has been pointed out already, at the same time, and I'm just wondering if something that is two or three days earlier can come within the umbrella of that rule. I think what the Zinn court was focusing on, Your Honor, was we're not going to look at a technical failure to draft a contract if the intentions of the parties were clear as between them. And here there have been oral representations. There's no denial. Even the general manager of River Landing says the whole intent, and I had the right page in front of me, but it's cited in my brief. Zinn also says if any portion of the proposed terms is not settled or no mode agreed upon by which they may be settled, then there is no agreement. I mean, it's pretty forceful on that, and then gives the out for contemporaneously signed writings. And I believe it says also the intentions of the parties. But, Your Honor, even if you were to find that it is an unenforceable agreement to agree, ILFSTA still gives us a legitimate claim because there were representations that were made that were untrue at the time they were made. Now, knowledge is not a requirement under ILFSTA. There's subsection A. It's 1602A2A, capital A, A2B, capital B, and A2C, capital C. Capital A says that it shall be unlawful for a developer to use a scheme to defraud, clearly fraud. Subsection capital B says to make use of any untrue statement of material fact or omission to state a material fact necessary in order to make the surrounding statements accurate in light of what was said. That is not fraud. That is straight from the Securities Act. And the reason it's written that way is so developers, just as people involved in securities cases, can't say, well, we didn't know it wasn't true when we said it. Sure, we said it, but we didn't know it wasn't true at the time that we said it. Do you dispute at all the fact that coliform bacteria dissipates over time and can be remediated by the application of lime? I'm certainly no scientist. There's nothing in the record that says that that can't be done, Your Honor. And so I'll just rely on the record and the experts that have stated that with their seals on it. What I will say is that what- You don't dispute it then? No. I have no basis to dispute it is my point. However, it's important to note that the last testing done prior to November 1, 2007, did find that one monitoring well was above acceptable standards. That's gone down since then. There's nothing in the record that says that whatsoever. The point is that the contract and the defendants admitted this in their answer to our complaint. We allege that the contract, when it says acceptable levels, means federal surface and groundwater standards. That's the allegation of the complaint. That was admitted in the answer. So they've admitted that's what that clause in the contract means. Acceptable groundwater standards means acceptable according to federal standards. And the last test was that somewhere in this community, there were above acceptable by federal standards fecal matter in the groundwater. And so we would contend- Your fraud is equating sample- Clark Group should have sampled and tested and reported. Is that what your fraud is? Because they didn't sample, that was fraud? It's a misrepresentation, certainly. We contend that it is also fraud. But the representation in the contract- Why is it- I'm sorry. I'm sorry. Why is it- I'm sorry. Was it represented that they would test as well? Yes. Your Honor, I would get your contract in front of me as quickly as I possibly could, but I think it would take me too long in the 30 seconds I have left. Is that it? No, no. Then don't, please. Are you referring back to the addendum? I am. Okay. It says we'll conduct sampling and monitor. Don't look for it. That's fine. Go ahead. It does say sampling. And so I'd like to close with the fact that even if you find that it is an agreement to agree that subsection 1702A2B does not require fraud, does not require that statements were made intentionally, only that there were material misrepresentations, there could be no more material representation of somebody buying contaminated property as to how exactly it will be claimed. Thank you very much. We will come down and greet counsel and proceed directly to the next case.
judges: Allyson K. Duncan, Barbara Milano Keenan, David C. Norton